Filed 6/17/22  In re J.Y. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.Y., a Person Coming Under the Juvenile Court Law. | D079912 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J520193A) |
| Plaintiff and Respondent, | |
| v. | |
| J.Y., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Ana L. Espana and Marian F. Gaston, Judges.  Affirmed.

Marisa L.D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

Minor J.Y. was detained from his parents at birth after he was exposed to cocaine and marijuana in utero. Father appeals orders denying his request under Welfare and Institutions Code[1] section 388 for placement of J.Y. with him and terminating his parental rights under section 366.26.[2] He contends that he qualified as a noncustodial parent under section 361.2 and, therefore, the court applied the wrong standard in considering his request. He also contends that the court and the San Diego County Health and Human Services Agency (Agency) did not comply with their duties of further inquiry under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; ICWA) and, therefore, substantial evidence did not support the juvenile court's finding that ICWA did not apply to J.Y. We disagree with these contentions and affirm the orders.

I

BACKGROUND

A.   *Family History*

Mother and Father are legally married and have multiple children together. The family has a long history of involvement with child welfare agencies. Over the years, the Agency received multiple reports about Mother's untreated mental health conditions and concerns that the children were not properly fed or cared for. There were also reports of domestic violence and verbal abuse between the parents and excessive physical discipline of the children. The family has struggled with housing instability,

---

[1]   Further undesignated statutory references are to the Welfare and Institutions Code.

[2]   Because appellant and minor share the same initials, we refer to appellant as Father and to minor by the initials J.Y. Mother is not a party to this appeal.

accessing and participating in services, and maintaining sufficient aid levels to meet minimum standards for food, clothing, and shelter.

B.    *J.Y.'s Detention*

In October 2019, J.Y.'s umbilical cord tissue tested positive for both marijuana and cocaine at birth, which indicated Mother used drugs during the last trimester of her pregnancy.  Nursing staff fed J.Y. in the hospital when Mother did not respond to the newborn's cues.  The Agency took custody of J.Y. due to the toxicology results and concerns about the parents' ability to care for him.

Mother denied using cocaine.  She said that her other children were living with Father and that he could have J.Y. as well.  Father was living in a motel and stated he was not currently in a position to care for the infant.  He believed he could manage the baby if his oldest daughter could help.

The Agency filed a petition in October 2019 alleging that J.Y. was a child within the jurisdiction of the juvenile court pursuant to section 300, subdivision (b)(1) because the child suffered or was at substantial risk of suffering serious physical harm or illness as a result of the failure or inability of both parents to protect or care for the child.  The Agency alleged that Mother used cocaine and marijuana during her pregnancy, that she had an untreated mental health diagnosis, and that she had demonstrated increased irritability and aggression toward J.Y.'s minor siblings.  The Agency alleged that Father knew about Mother's history of cocaine usage and mental health issues.

The Agency expressed concern that Father was not protective because he had taken their older children into his care at various points, but eventually all or some of the children returned to Mother's care.  Father made no efforts to obtain supplies to care for the infant J.Y.  He planned to

3

care for J.Y. and nine other children in the evenings after work. He said his adult daughter would watch the non-school-age children, including J.Y., along with the daughter's four children during the day. There were, however, reports that the adult daughter provided financial support for the family by exchanging sexual favors for money, apparently in an adjoining motel room. Father believed his family needed help to obtain permanent housing and Mother needed mental health help. Father thought the Agency would provide all necessary childcare supplies.

The Agency requested J.Y.'s removal from the custody of both parents. At the detention hearing on October 31, 2019, Father did not ask for J.Y.'s placement with him. He asked the court to give the Agency discretion to place the infant with him once he had the means and a plan to care for the child.

The court found that the Agency had made a prima facie showing that J.Y. was a person described by section 300, subdivision (b) and that removal from "both parents" was necessary. The court ordered J.Y. placed in a resource family foster home.

C.      *Jurisdiction/Disposition*

A social worker expressed concern in an interview with Father about his daughter engaging in prostitution. He said he could not stop her. When the social worker said he had a choice about who he used to care for his young children, Father said he knew she did not do it when he was away because the children would tell him if someone came to the room. Father was frustrated about his lack of resources and his struggle to support his many children. Father denied he was unable to care for his children, but said his limited resources made it difficult. Father was comfortable with J.Y.'s

4

placement in the foster care home. He said that it might be best to put all of the children in foster care for their safety due to lack of resources.

Four of the younger children were thereafter voluntarily placed in out-of-home care while the older children remained with Father. Father denied using drugs or alcohol, but admitted he used marijuana daily.

The jurisdiction and disposition report considered placement with Father as a noncustodial parent, but noted that he was not asking for placement due to his extremely limited resources. The Agency also noted that Father often left the older children to care for themselves or others while he was at work.

The Agency did not believe it was safe to return infant J.Y. to the home of either parent. Mother had disabling and debilitating mental health concerns. Neither parent had supplies for the infant. Both parents reported consistent use of marijuana. The social worker commented that the family had "a tremendous amount of stress with worrying about where they are going to live, how they are going to put food on the table and getting everyone from one place to another." Assessing the case was difficult due to the "complexities and ever[-]changing dynamics in the two homes." The Agency concluded that the current home environments for both parents posed an imminent risk of neglect, injury, or death to the infant.

The Agency expressed concern that Father would leave J.Y. in the care of unsafe people or around dangerous activities and that he could not provide stable food, clothing, or shelter to meet the infant's needs. Father's case plan included a parent education program and substance abuse testing. Father agreed to the case plan and to receive voluntary services to assist with housing so he could be in a position to care for J.Y.

In early December 2019, Father reported that six of his minor children were staying with Mother at a homeless shelter. Father said he lost his job and wanted to focus on obtaining food stamps and housing before looking for work. After Mother reported that she had an altercation with some of the children, she took them to Father's motel room and went to get something to eat. When she returned, he yelled at her and threatened to punch her.

About two weeks later, Father answered Mother's door during an unannounced home visit. He denied he was living there and said he was watching the children while Mother was out.

During a visit with J.Y., Father informed the social worker that he did not want to relinquish his rights to J.Y. and felt the child should be in Mother's care. Father said Mother exaggerated her mental health issues and he did not believe they impacted her ability to parent.

At the contested trial on January 14, 2020, the court received and considered the Agency's detention report, jurisdiction and disposition report, and the addendum report. Father asked the court to find that the Agency failed to meet its burden, dismiss the petition, and return J.Y. to the parents' care. He requested unsupervised visitation if the court made a true finding on the petition. Father did not object to the recommendation for parenting classes and random drug tests. He requested a referral to a housing program.

The court made a true finding on the petition and ordered that J.Y. would "remain removed from his parents." The court ordered supervised visitation for the parents. The court also ordered referrals to the housing program.

D.    *Six-month Review Period*

Six months later, in July 2020, the Agency reported that Father had been looking for housing since he obtained a housing voucher in mid-March. He reportedly had difficulty finding housing due to credit score requirements. He stayed with Mother when he did not have money to stay in motels, but denied living with Mother. Father said he and his son lived in a motel and they stopped by Mother's apartment to shower after work. Father was working again with his prior employer.

Mother's mental health and memory issues presented significant challenges for her treatment. Mother obtained housing, but was afraid to stay alone. Father expressed concern that Mother was using drugs because she did not return home for weeks at a time.

Father missed phone calls in April 2020 with a parent visitation coach and a group parenting referral. He enrolled in an online group parenting class, but did not attend. Father reported in late May 2020 that he understood someone would set him up with a parenting partner, but he had not heard from that person. The Agency was concerned that Father was avoiding services to help him address his anger and impulse issues. He was not participating in a domestic violence group as required by his case plan. A service provider said he attended two meetings, but she had not completed his intake interview and she had not seen him since she moved her practice. Father complied with requests for drug tests. On each test, he tested positive for marijuana and negative for other substances.

At a telephonic child and family team meeting on June 24, 2020, Father reported he was still waiting for a parenting group and was still looking for housing. Visits with J.Y. were virtual due to COVID-19 restrictions. Father engaged with the child during the video visits. He shared his observations

from these visits and asked about J.Y.'s progress. However, when the team discussed in-person visits, Father began to yell and curse saying the lawyers did not care about his family. He became more agitated and raised his voice when a team member mentioned that the parents needed to address their domestic violence issues. He admitted they got into a physical confrontation when Mother called him a racial slur, but said there would be no more domestic violence issues between them because they would not be around each other. Father then said he was " 'done with this meeting' " and abruptly hung up the phone. Mother became quiet and stated, "you would not understand, it's biblical." As the meeting continued, others on the call heard through Mother's line that Father entered Mother's home, gathered some belongings, cursed at her, and slammed the door while telling Mother not to contact him.

The Agency had concerns about Father's failure to take responsibility for his role in J.Y.'s detention. The Agency initially recommended termination of services for Father as of July 2020, but exercised discretion to recommend an additional six months of services due to disruption in his services and visitation due to the COVID-19 restrictions.

J.Y. remained in the foster home where he had resided since he was eight days old. He appeared to be happy, nourished, and adjusted. He was bonded with his caregivers and treated as a member of their family. He had a good bond with the caregivers' other children.

At the contested six-month review hearing in August 2020, the court adopted the Agency's recommendations.

D.     *Twelve-month Review Period*

Father completed a hair follicle test in October 2020, which tested positive for cannabinoids, amphetamines, and methamphetamines. Father denied using substances other than marijuana.

Father's housing situation was unchanged. He had only a few housing leads. He was let go from his job, but was later rehired. He received parenting services through a family support partner, but had not yet been assigned to a therapist. He reported struggling with anger and being " 'on the edge of losing it' " with the dependency case. During a child and family team meeting in November 2020, Father raised his voice and said the social worker was creating barriers to prevent him from getting his son back. He left the meeting and said he would not attend in-person visits with J.Y. because he was not comfortable with the caregivers.

Father attended some in-person visits but was not very interactive with J.Y. and did not stay close to J.Y. when he was climbing on objects. Father said he did not feel bonded with J.Y. because he missed in-person time during the first year of J.Y.'s life.

J.Y. continued to do well in his foster family. His caregivers loved and cared for him, were attentive to him, and took him to medical appointments, physical and occupational therapy, and infant education programs. Father expressed his gratefulness to the caregivers for caring for J.Y. so well.

The Agency believed it would be detrimental to return J.Y. to his parents' home because neither parent could meet his needs. Mother continued to use illegal substances and struggled with her own needs. Father continued to spend time with Mother and had a positive drug test. He was compliant with parent education, but did not participate in in-person visits between July 2020 and mid-October 2020. Father did not demonstrate

9

his abilities to feed, diaper, or engage with J.Y. He did not have the means to provide shelter or adequate supervision. In the status review report, the Agency initially recommended termination of reunification services for Mother, and continuation of services for Father to the 18-month hearing.

At the 12-month review hearing on December 9, 2020, both parents requested a trial. Father requested return of J.Y. to his care. He said that he obtained housing the day before and hoped to bring all the children home. The court set the matter for trial.

In February 2021, J.Y. received a working diagnosis of cerebral palsy. The Agency also changed its recommendations and requested terminating reunification services for both parents after receiving concerning information about Father's inability to maintain boundaries with Mother. The Agency learned that Father took the other dependent children to Mother's home during his unsupervised visits even though he was not permitted to supervise Mother's visits with the children. Father was let go from his job and his housing lead fell through. He had been unable to obtain housing in over a year. In an unannounced visit to Mother's home, Father answered the door. Both parents admitted that Father resided with Mother despite their differences and their history of domestic violence.

In March 2021, the Agency received reports that Father screamed in the face of one of his children as the child held his hands over his face. Father said he was disciplining the boy and talking to him about something serious.

The contested 12-month hearing was continued to April 16, 2021 to coincide with the trial on the siblings' case. In an addendum report filed before the contested hearing, Father reported that he secured a three-bedroom apartment and was waiting to finalize the paperwork. The Agency

10

reported that Father had recently moved out of Mother's home and only recently started putting up boundaries with Mother. The Agency continued to recommend termination of reunification services for both parents.

E.     *Termination of Services*

Father testified at the contested hearing that he signed a lease for a three-bedroom apartment. He needed furniture, including beds for the children, and the ability to obtain food. He requested placement of J.Y. with him.

After hearing the evidence presented, the court found it would be detrimental to place J.Y. with either parent. The court terminated services for both parents. The court found "with a heavy heart" that they were "out of time" for J.Y., that it would be "detrimental to place [J.Y.] with either parent," and that there was not a substantial probability that he could be returned to either parent by the 18-month review date, which was then only two weeks away. The court concluded by saying it had "no doubt that [Father] loves [J.Y.] and wants to be able to parent him, but he simply has not been able to invest the time. Sadly, we are at the end of the time allotted by the Legislature . . . for [Father] to show that he can safely parent [J.Y.]." The court set a hearing to determine a permanent plan pursuant to section 366.26.[3]

_____

[3]     Reunification services for the parent of a child who was under three years of age on the date of initial removal are generally provided with a presumptive minimum of six months of services, but no longer than 12 months from the date the child entered foster care, unless the child is returned to the home of the parent. (§ 361.5, subd. (a)(1)(B); *In re M.F.* (2019) 32 Cal.App.5th 1, 21; *In re Jesse W.* (2007) 157 Cal.App.4th 49, 59.) This expedited statutory scheme recognizes that "time is of the essence" for very young children in the foster system and they require " 'a more timely

11

F.    *Father's Section 388 Motion and Contested Section 366.26 Hearing*

Father filed a section 388 motion requesting the return of J.Y. to his care in September 2021. He stated that he had successfully reunified with his other minor children and he was compliant with his services. He stated that J.Y. would benefit from being raised with his siblings and from being part of the family's faith.

The Agency filed an addendum report recommending denial of Father's section 388 petition. The Agency noted that J.Y. was a happy toddler who was doing well with the caregivers he had been with since he was released from the hospital at eight days old. J.Y.'s caregivers had consistently ensured that all of his physical, developmental, and emotional needs were met. They were interested in adopting J.Y.

J.Y. had significant medical needs. He had been diagnosed with cerebral palsy, and his caregivers took him to multiple medical and nonmedical appointments each week. The caregivers had been diligent in informing Father of all services and appointments, but he had attended only one medical appointment and had not inquired on his own initiative.

Since Father's reunification services had been terminated in April 2021, he had missed all of his scheduled virtual visits with J.Y. and attended only 13 of his 20 scheduled in-person visits. Since reunifying with his older children in the summer of 2021, Father had cancelled approximately every other visit with J.Y. He appeared to be overwhelmed with the schedules of his older children.

The Agency stated that at J.Y.'s age (nearly two years old), consistent and frequent interaction was necessary to build healthy attachments with his

_____

resolution of a permanent plan because of their vulnerable stage of development.' " (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846-847.)

12

parental figures. Thus, the Agency did not believe it would be in J.Y.'s best interests to be placed with Father. The Agency also expressed concern about Father's ability to meet J.Y.'s ongoing medical and developmental needs if he were the primary caregiver.

Father's section 388 motion and the contested section 366.26 hearing were heard over four days between November 29, 2021 to January 6, 2022.

1.    *Testimony*

Father testified that most of his minor children were recently placed in his care. His 19-year-old son also lived with him. One minor child remained out of the home due to emotional or behavioral issues.

Father had stable housing for the last seven to eight months. He denied having a substance abuse problem and said he complied with every request for a drug test. He completed a parenting class and he addressed issues of domestic violence and codependency in individual therapy. Father denied learning anything in his parenting class. He said he knew most of what was taught from raising so many other children. He believed he could take care of all his children.

Father said he had not had much contact with Mother since March 2021.

Father considered his 19-year-old son to be his parenting support because the son would sit with the children if needed. According to Father, most of the children were old enough to look after one another.

J.Y. never lived with Father. During Mother's pregnancy with J.Y., Father was homeless and living on the street while Mother stayed in a shelter with the other children. He denied knowing she used drugs.

Father believed his visits with J.Y. were consistent. He cancelled several visits when he had conflicts with other appointments for his case

13

plan. Father denied knowing he was scheduled for weekly virtual visits in addition to weekly in-person visits. When Father saw comments in Agency reports that he was not attending virtual visits, he did not seek to arrange virtual visits because he had things to do with his other children.

Father thought he and J.Y. had "somewhat of a bond." He believed J.Y. understood Father was his biological father. Father thought the COVID-19 restrictions hindered his ability to make a connection. A social worker testified that J.Y. did not call Father by any name. He did not appear distressed at the end of any visit.

After Father regained custody of his other children, he took them to visits with J.Y. J.Y. interacted and played well with the other children during visits. The social worker reported that the older siblings checked in at the beginning and the end of the visits with J.Y., but explored other parts of the park on their own. The social worker expressed concern that Father was unable to see or hear the children at the other part of the park. Father denied that he did not adequately supervise the other children. Because most of the children are older, he did not believe he needed to supervise them in the same fashion as the younger children.

Father allowed J.Y. to ride a scooter with an older sibling. J.Y. did not have a helmet and wore leg braces. The social worker expressed safety concerns about allowing the children to go too far away from him. Father minimized concerns that J.Y. was in danger.

Father did not provide diaper supplies because the caregiver brought those items. He said he brought snacks, clothing, and shoes. After reunification with his other children, Father claimed he cancelled two visits with J.Y. because of childcare issues or because he was tending to matters required by the dependency proceedings for his other children.

14

When asked about the March 2021 incident in which he was observed screaming in the face of one of the children, Father denied the incident occurred the way it was reported. He said he needed to raise his voice to get the child's attention about a serious issue.

Father disagreed that there was not enough space for J.Y. in the family's home. They lived in a three-bedroom apartment and he had a small bed for J.Y. The girls slept in one room, the boys slept in another, and Father said he had separate beds for J.Y. and the next youngest child in his room.

Father acknowledged he had a lot of responsibilities with his many children. But he believed he could include J.Y. in the family. He said he understood J.Y.'s medical conditions, which include a working diagnosis of cerebral palsy and an issue with his eyes. He believed he could keep J.Y.'s medical appointments and therapy. Father believed J.Y. deserved to know and be a part of his family.

Father's urine drug tests were consistently negative for substances, except for marijuana. He agreed a hair follicle test was positive for methamphetamine, but stated this was a false positive. He denied using methamphetamine. When he attempted to retest, he was told they did not obtain a sufficient sample. He did not retest thereafter. Father still uses marijuana, but denied using it around the children.

Father admitted his oldest son was not permitted to live with him in his current housing. Under the terms of his housing voucher, he was only allowed to have seven people live with him whereas there were nine people living in the home at the time of the hearing.

2.    *Court Rulings*

On December 22, 2021, the court found that there were changed circumstances for Father given that he reunited with the older children, had

15

housing, and was participating in services. The court commented that it appeared Father had the most stability he had had in a long time. However, the court found that it was not in J.Y.'s best interests to place him in Father's home and denied Father's section 388 petition.

At the next hearing on January 6, 2022, the court terminated all parental rights and declared J.Y. free from both Mother and Father. The court noted that Father visited J.Y. more often than Mother, but his visits were limited to one supervised visit per week and were not consistent. The court found there was no substantial positive emotional attachment between Father and the child. Father's relationship with J.Y. was more like a friendly visitor whereas the child had a significant attachment to his caregivers, who provided the only home he has known. The court found that there was no significant parental bond between Father and J.Y. that would outweigh the benefits that adoption would provide for the child. The court found that adoption was in the best interests of the child and ordered adoption as the permanent plan.

## II

## DISCUSSION

A.    *The Court Properly Denied Father's Section 388 Petition*

Father contends the juvenile court erred in considering his section 388 petition using the "best interests" standard generally applied to a motion requesting a modification of a juvenile court order due to changed circumstances. (§ 388, subds. (a)(1), (d); *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157 (*G.B.*).) Father argues that the court should instead have used the "detriment" standard for placement with a noncustodial parent under *In re Liam L.* (2015) 240 Cal.App.4th 1068, 1086 (*Liam L.*). He alternatively contends that

16

even if the juvenile court applied the correct standard, it abused its discretion in denying his petition. We disagree.

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169.) If the court removes the child from the care of the custodial parent pursuant to section 361 at the dispositional hearing, section 361.2 requires the court to determine "whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of [s]ection 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a); *In re Zacharia D.* (1993) 6 Cal.4th 435, 453 (*Zacharia D.*).) " 'A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm.' " (*Liam L., supra,* 240 Cal.App.4th at p. 1086.)

Section 361.2, subdivision (a) generally applies at a dispositional hearing after a child has been removed from the care of the custodial parent. (*Zacharia D., supra*, 6 Cal.4th at p. 453.) However, courts have held that a noncustodial parent may raise the issue of placement later in the proceedings by seeking modification of a juvenile court's disposition order under section 388 based on new evidence or changed circumstances. (*Zacharia D.,* at pp. 454–455; *Liam L., supra*, 240 Cal.App.4th at pp. 1083–1084.)

Typically, "[s]ection 388 provides an ' "escape mechanism" ' for parents facing termination of their parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification

17

services have been terminated.  [Citation.]  This procedural mechanism, viewed in the context of the dependency scheme as a whole, provides the parent due process while accommodating the child's right to stability and permanency.  [Citation.]  After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests.  [Citation.]  Section 388 allows a parent to rebut that presumption by demonstrating changed circumstances that would warrant modification of a prior court order."  (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)  The petitioner bears the burden of showing, by a preponderance of the evidence, both:  (1) a change in circumstances or new evidence; and (2) that the requested order is in the child's best interests.  (§ 388, subds. (a)(1), (d); *Stephanie M., supra*, 7 Cal.4th at p. 317; *G.B., supra*, 227 Cal.App.4th at p. 1157.)

Although the juvenile court here applied the statutory "best interests" standard (§ 388, subd. (d)), Father contends that it should have applied the detriment standard of *Liam L.*  In *Liam L.*, several minors were detained based on reports of physical abuse by their mother.  (*Liam L., supra*, 240 Cal.App.4th at p. 1074.)  The minors' father, who lived out of state and had not seen the children for five years, learned about the dependency proceedings and contacted the Agency.  (*Ibid*.)  He chose not to seek immediate custody so that the mother would have an opportunity to reunify with them.  (*Id.* at p. 1075.)  In the meantime, however, the father made efforts to develop a relationship with the children, including visitation.  (*Id.* at p. 1076.)  At the 12-month review hearing, the court terminated the mother's reunification services and ordered the children placed with the "nonoffending" father.  (*Id.* at pp. 1077-1079.)  Although the father had not actually filed a section 388 petition, we concluded that such a petition was

18

the proper remedy for a noncustodial parent to seek placement after the disposition hearing, and we found it to be harmless error that he had not actually filed one. (*Id.* at pp. 1082-1084, 1086.)

On the merits, we ruled that when a noncustodial parent files a section 388 petition seeking custody for the first time after the disposition hearing, a court "must place the child with the noncustodial parent unless the opposing party establishes that the placement would be detrimental to the child's safety." (*Liam L.*, *supra*, 240 Cal.App.4th at p. 1085.) Our conclusion was compelled by: (1) a nonoffending parent's constitutional right to care and custody of his or her child in the absence of a finding that it would be detrimental to the child; and (2) the underlying presumption in California's dependency scheme that it is in the child's best interests to be placed with a parent absent a finding of detriment. (*Id.* at pp. 1080, 1084-1086.)

We emphasized that in this context, the detriment and best interests standards " 'are basically two sides of the same coin. What is in the best interests of the child is essentially the same as that which is not detrimental to the child.' " (*Liam L.*, *supra*, 240 Cal.App.4th at p. 1085; see also *id.* at p. 1086 ["In this context, a finding of detriment is equivalent to a finding that placing the dependent child with the noncustodial parent is not in the child's best interests"].)

In *Liam L.*, however, we expressly declined to "consider whether the presumption that placement with the noncustodial parent would be in the minors' best interests (and resulting analysis) would still be applicable if the noncustodial parent participates in reunification services, the parent fails to make substantial progress, the court terminates those services, and the court sets a selection and implementation hearing under section 366.26." (*Liam L.*, *supra*, 240 Cal.App.4th at p. 1086.)

19

The latter situation is presented here. Father was involved in the dependency case from the outset. When J.Y. was detained at birth, he was removed from both parents' care based, in part, on allegations that Father knew about Mother's cocaine usage and mental health issues, his inability to be protective, and the history of domestic violence between the parents. The court provided Father with nearly two years of reunification services, but terminated them at the 12-month review hearing after he failed to make substantial progress. The court then set a hearing to determine a permanent plan under section 366.26. These are exactly the circumstances we declined to address in *Liam L.*

We now conclude that the *Liam L.* detriment standard does not apply in these circumstances. Critically, by the time Father filed his section 388 petition, the juvenile court had already twice made findings that it would be detrimental to place J.Y. with him. First, at the six-month review hearing, the court found by clear and convincing evidence that return of J.Y. to either parent would create a substantial risk of detriment to his physical or emotional well-being. Second, at the contested 12-month hearing, when Father requested that J.Y. be placed with him, the court found that Father had made no progress in alleviating or mitigating the causes necessitating placement, and that it would be detrimental to place J.Y. with Father due to Father's issues with uncontrolled anger as well as his alcohol and marijuana and an unexplained positive test for methamphetamine.

In these circumstances, the court was not required to apply the detriment standard yet again in ruling on Father's section 388 petition. Where a parent has been given the benefit of reunification services, failed to make significant progress, and the court has terminated reunification services based on a finding of detriment, the proper standard for reviewing a

20

parent's subsequent section 388 petition is the statutory "best interests" standard. (§ 388, subd. (d).) The detriment standard we adopted in *Liam L.* was intended to protect the constitutional rights of a nonoffending, noncustodial parent who had *not* previously been the subject of any finding that placement with him or her would be detrimental to the children.

Our conclusion is consistent with the policies underlying the dependency scheme. "[A]fter reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability. [Citation.] 'A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.'" (*In re J.C.* (2014) 226 Cal.App.4th 503, 527, quoting *Stephanie M., supra*, 7 Cal.4th at p. 317.) Because the court here had already terminated Father's reunification services and made findings that placement with him would be detrimental to the children by the time he filed his section 388 petition, the focus had shifted from family reunification to J.Y.'s needs for permanency and stability. The statutory "best interests" standard is the proper standard for ruling on a section 388 petition in these circumstances.

We further conclude that the juvenile court did not abuse its discretion in applying the best interests standard. In ruling on Father's section 388 petition, the court carefully considered the evidence and the testimony as well as the history of the dependency case. The court acknowledged that Father's circumstances had changed and recently became more stable than they had been in a long time after he obtained housing and reunited with his older children. For reasons it explained in detail at the hearing, however, the court ultimately determined it could not find that it was in J.Y.'s best interests to place him with Father.

21

The court observed that J.Y. was placed in his foster home eight days after his birth when he was released from the hospital. He had formed an attachment with his caregivers over the past two years and called them " 'Mommy' " and " 'Daddy.' " J.Y. never lived with either parent or his siblings. J.Y.'s cerebral palsy diagnosis required constant supervision and presented safety challenges for his caregivers. It also required multiple medical appointments every week.

Father had not progressed beyond one in-person supervised visit per week and he only attended 65 percent of the scheduled visits since the termination of reunification services in April. He also had not participated in virtual visits during that time. The court found it concerning that Father did not contact the caregivers between visits to ask about J.Y.'s well-being or medical needs or to seek additional opportunities to interact with him. The court did not find credible Father's claim that he was not permitted to contact the caregivers. Father had not formed a significant parental bond with J.Y. and was not fully aware of his needs. The court agreed with an Agency assessment that it appeared Father was " 'content with the knowledge that [J.Y.] is well cared for by his caregivers and has the advantage of seeing him once a week.' "

The court also expressed concern that a month after Father reunified with eight of his children, one of his children was again removed because Father could not manage the child's behavioral issues. Additionally, Father had more people living in the home than was allowed by his housing rules, even without J.Y. in the home.

The juvenile court's factual findings are supported by the evidence, and it did not abuse its discretion in applying the best interests standard. Although it is commendable that Father made changes to his life to provide

22

more stability to himself and his older children, there is nothing arbitrary or capricious about the court's determination that placement with Father was not in J.Y.'s best interests. (*Stephanie M., supra,* 7 Cal.4th at p. 318; *In re Y.M.* (2012) 207 Cal.App.4th 892, 920.) After Father's reunification services were terminated, the focus shifted to J.Y.'s needs for permanency and stability. (*Stephanie M.,* at p. 317.) Considering the totality of the record, the court properly exercised its discretion to deny Father's section 388 petition and leave J.Y. in the custody of the caregivers he has been with since birth.

B.     *ICWA Inquiry*

Father also contends that there is no substantial evidence to support the juvenile court's finding that ICWA does not apply to this case because the Agency and the court failed to comply with their duties of inquiry. We again disagree.

1.     *General Principles*

Congress enacted ICWA to address concerns regarding the separation of Native American children from their tribes through adoption or foster care placement. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) An " 'Indian child' " is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definition of " 'Indian child' "].) Under California law adopted pursuant to ICWA, the juvenile court and the Agency have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a); *Isaiah W.,* at p. 9.)

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a

23

minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child.  (§ 224.2, subds. (a), (b).)  Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.)  Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply.  (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)  We review the juvenile court's ICWA findings for substantial evidence, but "where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*D.S.,* at p. 1051.)

2.      *Procedural Background Regarding ICWA Inquiry*

In this case, the Agency noted at the inception of the case that Mother reported in a prior dependency proceeding that she had Sioux heritage through her father.  However, she said she was not a registered member and did not feel connected to it.

At the detention hearing, Mother advised her attorney and the court that her grandmother said they had Sioux heritage, but that Mother had no contact with these relatives.  The court ordered the Agency to make

24

reasonable efforts to determine if the child was entitled to any of the ICWA provisions.[4]

In November 2019, the Agency's social worker reported that Mother had spoken to a cousin who said the family has Cherokee rather than Sioux heritage. The social worker spoke to the cousin who said there is limited information within the family about their heritage. She heard that her great great great grandmother was a " 'full blooded Cherokee' " but the cousin had no information about the relative's name or dates of birth and death. The social worker asked the cousin to reach out to other family members to see if anyone else had helpful information. The cousin asked the social worker to call again the next day. The social worker did so, but had to leave a message.

A social worker left additional messages for Mother's cousin in February and April 2020. When the cousin did not return the calls, the social worker also spoke with Mother again to ask for a different contact number. Mother confirmed the contact information. By July 2020, the cousin still had not responded.

At the contested six-month review hearing in August 2020, the court directed the Agency to continue to follow up with the cousin regarding possible Native American ancestry.

In December 2020, the Agency reported that a social worker spoke with a maternal aunt who said that Mother shared they have Native American heritage through their father. The aunt was unaware of this information. The aunt provided a phone number for maternal grandfather and said she would reach out to the cousin the Agency previously contacted. The social worker left a message for the maternal grandfather.

---

4    Father denied he has any Native American ancestry.

In October 2021, the Agency sent ICWA inquiries to 18 Cherokee and Sioux tribes across the country identifying the parents, the children, and several of Mother's relatives. The Agency received responses from 12 tribes, each stating the children are not eligible or enrolled members. The social worker interviewed Mother again in October 2021 about any Native American ancestry. Mother said she only reported what she had heard, but that any tribal connection was " 'generations long time ago.' " Mother said she had no proof or information and said she had no contact with or contact information for her father's family. According to Mother, she had no affiliation with any tribe, she had no reason to believe J.Y. was an Indian child, and she had no relatives who may have more information.

In connection with the section 366.26 hearing, the Agency submitted evidence regarding the tribal inquiries along with stipulated testimony from the social worker stating that she had not heard from additional relatives after inquiring about additional information. Based on the additional evidence, the court found that there was no reason to believe that ICWA applied to this matter.

3. *Analysis*

The juvenile court's ruling is supported by substantial evidence. Mother's statements about possible Native American ancestry triggered a duty to conduct further inquiry. The Agency conducted a further inquiry by interviewing Mother and available extended family members.[5] The social

---

[5] ICWA defines " 'extended family member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [" 'extended family member' . . . defined as provided in [§] 1903" of ICWA].)

worker spoke to a maternal cousin and a maternal aunt to gather relevant information. The worker attempted to obtain contact information for additional relatives and left a message for maternal grandfather. When the Agency received no further responses, the Agency took the additional step of contacting 18 tribes that reasonably could be expected to have information about the child's membership or eligibility. (§ 224.2, subd. (e).) Each tribe that responded indicated there was no evidence of tribal membership or eligibility for J.Y. or his siblings.

Father criticizes the social worker for asking Mother's relatives to inquire of other family members rather than calling additional individuals herself. However, Father does not identify any additional family members the Agency should have contacted.

Although the Agency "has the obligation to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status" (*In re K.R.* (2018) 20 Cal.App.5th 701, 709), it and the juvenile court are not obligated " 'to cast about' " for investigative leads. (*In re A.M.* (2020) 47 Cal.App.5th 303, 323.) The Agency and the juvenile court satisfy their duty of inquiry if the parent does not provide information requiring follow-up, or if individuals with additional information refuse to talk to the Agency or are deceased. (*Ibid.*)

We conclude substantial evidence supports the juvenile court's finding that the agency complied with its obligations of inquiry and further inquiry. Thus, the trial court committed no error in ruling that there was no reason to know ICWA applied. Moreover, even if the Agency could have done more, there is no indication "that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*In re*

27

*Benjamin M.* (2021) 70 Cal.App.5th 735, 744; *In re Antonio R.* (2022) 76 Cal.App.5th 421, 435.)  Therefore, even assuming any error, it was harmless.

## DISPOSITION

The orders of December 22, 2021 and January 6, 2022, are affirmed.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.